UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 13-20062-CR-COOKE

UNITED STATES OF AMERICA,

    Plaintiff,

v.

TANYA PEREZ-VALLEDOR

    Defendant.

_____/

**MOTION FOR DOWNWARD VARIANCE FROM THE GOVERNEMENT'S REQUESTED TWO-YEAR VARIANCE SENTENCE AND <u>INCORPORATED MEMORANDUM OF LAW</u>**

The defendant, Tanya Perez-Valledor, through her undersigned counsel, files this Motion for Downward Variance from the Government's Request for Two-Year Sentence and Incorporated Memorandum of Law and in support thereof states:

<u>**INTRODUCTION**</u>

The era of mechanized application of the Sentencing Guidelines to formulate an appropriate sentence is over. The United States Supreme Court's decision in *Pepper v. United States,* 562 U.S. - 131 S. Ct 1229 (2011), makes it abundantly clear that an era of individualized sentencing has begun and appears to be here to stay. It has been the law for several years that the sentencing guideline range is not presumptively reasonable, is advisory only, and is but one and certainly not the most important factor the Court must consider in fashioning a reasonable sentence. *Rita v. United States*, 127 S.Ct. 2546 (2007); *Gall v. United States*, 128 S. Ct. 586 (2007). In *United States v. Hunt*, 459 F. 3d 1180 (11th Cir. 2006), the Court held that there are "many instances" where the guideline range will not yield a reasonable sentence. *Id.* at 1184. The court held that District Courts are obligated to impose a reasonable sentence regardless of the guideline range, so long as the guideline has been considered. *Id*.

1

In the United States Supreme Court's most recent decision minimizing the impact of the guidelines on imposing a reasonable sentence, the Court stated:

> "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81 (1996). Underlying this tradition is the principle that "the punishment should fir the offender and not merely the crime." *Williams,* 337 U.S. at 247, 69 S. Ct. 1079.

*Pepper supra.* 1239-40 [Emphasis added]. The Court went on to say:

> In particular, we have emphasized that "[h]ighly relevant if not essential – to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Id.* At 247, 69 S. Ct. 10-79. permitting sentencing courts to consider the widest possible breath of information about a defendant "ensures that the Punishment will suit not merely the offense but the individual defendant." *Wasman v. United States*, 468 U.S. 559 (1984).

*Id.* at 1240. While Courts should give "respectful consideration" to the advisory guidelines and their accompanying policy statements, the court in *Pepper* stressed that post-*Booker* decisions make clear that a district court may in appropriate cases impose a non-guideline sentence based on a disagreement with the Sentencing Commission's view. *Pepper*, *supra* at 1247.

With the exception of unconstitutional considerations (e.g., race, sex, etc.) there is no limit to the type and nature of information a court may consider in imposing a reasonable sentence. This point was made abundantly clear by the United States Supreme Court in the opening paragraph of its decision in *Pepper*, *supra.*:

> This court has long recognized that sentencing judges "exercise a wide discretion" in the types of evidence they may consider when imposing sentence and that "[h]ighly relevant, if not essential-to [the] selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics." *Williams v. New York*, 337 U.S. 241, 246-247, 69 S. Ct. 1079, 93 L Ed. 1337 (1949). Congress codified this principle at 18 U.S.C. §3661, which

2

>  provides that "[no] limitation shall be placed on the information"
>  a sentencing court may consider concerning the [defendant's]
>  background, character and conduct" and at §3553(a), which sets
>  forth certain factors that sentencing courts must consider, including
>  "the history and characteristics of the defendant." §3553(a)(1)

*Pepper*, *supra.* at 1235.

## **RELEVANT GUIDELINE SENTENCING ISSUE**

>  U.S.S.G. §5H1.1      Age (Policy Statement)
>
>  Age (including youth) is not ordinarily relevant in determining whether a departure is warranted. *Age may be a reason to depart downward in a case in which the defendant is elderly and infirm and where a form of punishment such as home confinement might be equally efficient as and less costly than incarceration.* Physical condition, which may be related to age, is addressed at §5H.1.4. (Emphasis supplied).
>
>  U.S.S.G. §5H1.4      Physical Condition
>
>  Physical condition or appearance, including physique, is not ordinarily relevant in determining whether a departure is warranted. *However, an extraordinary physical impairment may be a reason to depart downward; e.g. in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment.* (Emphasis supplied).

The Sentencing Commission was so concerned about the societal costs of imprisoning elderly and infirm individuals that it specified the need for a sentencing court to consider a downward departure or variance for such individuals – even to the extent of substituting house arrest for imprisonment – in two separate policy statements. A sentencing court is required by statute to consider these policy statements when imposing sentence. See 18 U.S.C. §3553(a)(5): *Kimbrough v. United States*, 552 U.S. 85, 101 (2007)(the statute provides that in determining the appropriate sentence, the court should consider a number of factors including "any pertinent policy statement" issued by the Sentencing Commission). Further, 18 U.S.C. §3553 (a)(2)(D) requires that, in determining a sentence, the sentencing court consider the need "to provide the defendant with needed…medical care…in the most effective manner."

3

For example, in *United States v. McFarlin*, 533 F.3d 808 (8th Cir. 2008), the defendant was 56 years old at the time of sentencing, had undergone multiple heart surgeries, and suffered from coronary artery disease as well a number of other medical conditions. Pursuant to a plea agreement, he pleaded guilty to conspiracy to distribute 102 grams of cocaine base, charged under the general conspiracy statute, 18 U.S.C. §371. Despite the fact that his guidelines range was 78-97 months, the Court affirmed the defendant's sentence to three (3) years probation and no imprisonment as being reasonable, noting:

> The Guidelines and our decisions prior to *Gall* allow variances on the basis of poor health. U.S. Sentencing Guidelines Manuel §§5H1.1; 5H1.4 (2007); *United States v. Wadena*, 470 F.3d 735, 739-40 (8th Cir. 2006). Guideline 5H.14 states that a court may give a non-prison sentence if the defendant's is "seriously infirm" and it would be "as efficient as, and less costly than imprisonment." §5H1.4. The Guidelines also provide that, when considering a defendant's age, a court may consider alternative forms of incarceration for an elderly, infirm defendant that would be "equally efficient" as incarceration. §5H1.1. Further, Section 3553 (a)(2)(D) states that a court may consider the need for medical care when determining a sentence. 18 U.S.C. §3553(a)(2)(D).

See also: *United States v. Montgomery*, 265 Fed. Appx. 840 (11th Cir. 2006) (court approved below guidelines sentence to a defendant convicted of bank fraud where the defendant had no criminal history, the defendant's ability to pay court ordered restitution would be impaired by a lengthier sentence, and the defendant had a history of mental illness).

### SENTENCING FACTORS UNDER §3553 AND U.S.S.G.L.

This Court is required to impose a sentence which is "sufficient but not greater than necessary, to comply with the statutory purposes set forth in paragraph (2) of [18 U.S.C. §(a)]."[1] It is respectfully submitted that once this Court weighs all of the relevant factors, it will agree any benefit to society of incarcerating Tanya Perez-Valledor for any period of time will be far outweighed by the financial costs of imposing such a sentence. The defense asks this Court to

---

[1] The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote just respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most efficient manner.

follow the guidance of the Sentencing Commission's Policy Statements and impose a more cost effective and merciful sentence, a sentence which will permit Tanya Perez-Valledor, a 69 year old, first, non-violent offender to continue to receive the medical care and the suggested psychological care she most desperately needs in the most efficient manner - a term of probation with house arrest as a substitute for imprisonment.

Considering the factors set forth in 18 U.S.C. §3553(a) and the statutory requirement that this court must sentence Ms. Perez-Valledor to a sentence sufficient, but not greater than necessary to comply with the purpose set forth in §3553(a), it is respectfully submitted that a consistent with the government's request for a downward variance to a 2-year sentence that a sentence significantly below the probation calculated guideline range of 46-57 months or the defense calculated range of 37-46 months is appropriate. The government in this case, as part of the terms of the Plea Agreement, (DE 73), is expected to move this Court for a downward variance with a suggestion that two-years incarceration is consistent with the sentence received by other therapists sentenced by Judge Scola in Case Number: 11-20587-CR-SCOLA. Tanya Perez-Valledor submits that the downward variance to a two-year sentence although a positive circumstance is not individually formed sentence that meets the criteria in §3553 sentencing factors.

The therapists in Case Number: 11-20587-CR-SCOLA individually agreed as a matter of fact and law that their conduct constituted "sophisticated means" and the enhancement resulted in a more significant U.S.S.G.L. sentence. Consistent with government characterization and agreement there are no enhancements that should apply to Tanya Perez-Valledor conduct. Tanya Therefore, *unlike* the other therapists in Case Number: 11-20587-CR-SCOLA Tanya Perez-Valledor did not engage in sophisticated means in this offense. (DE 74 and DE 74). This marked distinction is one that justifies a potentially lower sentencing consideration from this sentencing court as compared the therapists in Case Number: 11-20587-CR-SCOLA who received below guidelines sentencing consideration from Judge Scola. Additional individual §3553 factors provide additional support to the position that a sentence of probation with house arrest is a punishment sufficient but not excessive for the 69- year-old first offender's illegal non-violent minor role offense conduct in this matter. Ms Tanya Perez Valledor cooperated with the government which may be an additional reason to downward vary from the U.S.S.G.L in this matter.

Ms. Perez-Valledor was a therapist who worked for Biscayne Milieu conducting group therapy sessions. She was encouraged by others in the atmosphere of Biscayne Milieu PHP to cut and paste therapy notes for patients. In particular, she submitted therapy notes for patients who were not present for their therapy session on July 4th, but were instead at a picnic where no therapy session occurred. Significantly, Ms. Perez-Valledor did not receive any extra benefits or a share of the proceeds from the fraudulently obtained Medicare payments but rather received a stable weekly salary which was stable regardless of how many or how few patients were seen in each group. Ms. Perez-Valledor's compensation was not based upon the number of patients seen or the number of reports submitted.

Given Ms. Perez-Valledor's history and characteristics, a sentence of 24 months consistent with the government request for downward variance, or even at the low end of her guidelines, is a sentence far greater than necessary to comply with the purposes set forth in §3553(a). Among the most critical factors warranting a downward variance to probation or house arrest sentence are the following: (a) a downward variance would avoid an unwarranted sentence disparity between Ms. Tanya Perez-Valledor and co-defendants who agreed that their conduct was completed using sophisticated means while hers was not; (b) Ms. Perez-Valledor's plea agreement, unlike the plea agreements for therapists in 11-20587-CR-SCOLA, provides that her conduct should not be characterized as having any additional enhancements which is different from the therapists in 11-20587-CR-SCOLA. The government has indicated on its own, without any accompanying agreements, that it will request a downward variance which was not a government request in front of Judge Scola; (c) her willingness and event of truthful cooperation; (d) she is a first time offender; (e) her age of 69 is much older compared to the younger therapist who were in middle age not old age at the time of their offense; (f) her medical issues are serious and require medical care; (g) probation has recommended psychological therapy for Ms Perez-Valledor which can be accomplished in a house arrest probation setting but not in a prison setting; (h) probation has after reviewing all the defendants including therapists conduct in the Biscayne Milieu case declared Tanya-Perez-Valledor should receive a minor role for her conduct in the offense  (publically available records which are accessible to appointed counsel records do not indicate whether or not the therapists in 11-20587-CR-SCOLA were thought to have a minor role or not but clearly the therapist defendants did not argue on way or another for the role reduction consideration; (i) Ms. Perez-Valledor's 69 years of age is additionally significant as

she presents a very low risk of recidivism; (j) Ms. Perez-Valledor has several documented serious medical conditions mentioned above however recently at a doctor's appointment, Ms Tanya Perez-Valledor was immediately sent by ambulance by the medical doctor to the Emergency Room Hospital where she was admitted into the hospital; (k) she has truthfully expressed her earnest regret and serious remorse for her actions; (l) and Ms. Perez-Valledor's otherwise lifetime of good character all support the position that a probationary or house arrest sentence is sufficient but not greater punishment than necessary. .

## MS. PEREZ-VALLEDOR MEETS THE CRITERIA OF §§5H1.1 & 5H1.4. SHE IS ELDERLY AND HAS SERIOUS MEDICAL CONDITIONS

The one certainty in is that Ms. Tanya Perez-Valledor is not merely aging at 69-years old- she has become frail and is having neurological gait problems as documented by probation. Her earnest remorseful state of mind has necessitated recent psychological treatment and monitoring by a psychiatrist. Her recent medical reports; supporting blood testing, and doctor diagnosis opinions have been provided to probation. They are voluminous. Most recently, after the PSI was submitted, Tanya Perez-Valledor was at her doctor's office when the doctor rated her extraordinary high blood pressure. The doctor immediately called for an ambulance. Ms. Perez-Valledor was rushed to the hospital and was admitted for emergency hospital care and treatment. Paragraphs 63 through 70 of the PSI summarize the recent medical history of this 69 year old woman. Additional medical report and opinions were subsequently provided to probation regarding Ms. Tanya Perez-Valledor kidney condition (level III) and her other frail health conditions.

## COSTS OF INCARCERATION OF AN ELDERLY AND INFIRM DEFENDANT SUCH AS TANYA PEREZ-VALLEDOR ARE ASTRONOMICAL AND THE LEVEL OF CARE FOR CHRONICALLY ILL PATIENTS IS OFTEN DEFICIENT

As shown by the United States Bureau of Prison's own data on the Federal Prison System Operating Cost per Inmate (Exhibit 1), the annual cost per inmate had risen to $25,000 in 2003. That was ten years ago. Based upon the rate of growth, the cost today is more likely in the range

of $30,000 per year.[2] These figures, however, reflect the average costs of incarcerating an inmate who is neither aged nor infirm.

Tanya Perez-Valledor, however, is not an average potential inmate. (See PSI ¶62 - ¶ 71 with Valledor's massive medical records being available to this court for perusal under seal upon request). The additional information recently received is that Ms Tanya Perez-Valledor is Level III diagnosis of Kidney failure. At her age and with her serious accompanying medical problems she is unfortunately not eligible under UNOS Organ standards for transplantation. By any standard, at 69 years old she is considered to be "elderly" and there is no question, based upon her medical history and records that she is suffers from several concurrent diagnosed serious medical conditions. She is growing more medically compromised very day. The cost to society of incarcerating elderly and infirm individuals is astronomically higher than the cost of incarcerating younger and healthier individuals.

The costs to society in incarcerating elderly individuals, particularly for lengthy sentences, have been addressed in two publications in 2012. In January 2012, Human Rights Watch ("HRW"), an international organization dedicated to protecting the human rights of peoples around the world, published a report titled "Old Behind Bars, the Aging Prison Population in the United States." (Exhibit 2). In June 2012, the American Civil Liberties Union (ACLU) published its report, "At America's Expenses: The Mass Incarceration of the Elderly." (Exhibit 3). Both address the aging prison population of the United States. The ACLU report focuses on trends and costs involved, whereas the HRW report goes into more depth with respect to the problems created by an aging prison population not only for the institutions, but for the individual prisoners. For example, the ACLU report pointed out that the estimated annual incarceration cost of a state prisoner of average age is $34,135.00, whereas the middle estimated annual incarceration cost for an aging prisoner is twice as much, $68,270.00. This then is compared to the cost of parole which ranges between $3.50 to $13.50 per day, regardless of whether or not the parolee is of average age or elderly. The HRW report goes into somewhat more detail as to why this is so:

> In general, the older people are, the more barriers they have to an active, independent life, the greater their physical and mental needs, and the harder it is for them to live and function with dignity. The difficulties can be even

---

[2] Counsel discovered this information through an internet search but was unable to find specific published data on this more recent than 2003.

> greater for those elderly who are in prison. Prisons are primarily designed for the young and able-body; it takes additional effort on the part of correction officials to meet the needs and respect the rights of the old and infirm. (Exhibit 2 at p. 43).

Some of the special needs required by elderly prisoners are described as follows:

> Older persons are more likely to develop disabilities that require the use of assisted devices such as glasses, hearing aids, wheel chairs, walkers and canes. As in the community, the elderly prison suffer from falls, which contribute to fractures and the high health costs. One California study found that 51% of geriatric women prisoners aged 55 or over reported a fall in the past year. In the community, falls are associated with poor lighting, uneven or icy pavement, lose rugs, and lack of handrails. In prison, there are additional potential hazards, including top bunk assignments and crowds of quickly moving young inmates oblivious to the slower, more fragile older inmates among them. (Exhibit 2 at p. 46).

These are just the problems faced when an institution needs to deal with an elderly, yet relatively healthy individual. These problems become even more pronounced when the prisoner suffers from serious medical conditions, as does Ms. Tanya Perez-Valledor. Furthermore, as pointed out at pages 72-73 of the HRW report, it states:

> Older prisoners are at least two to three times as expensive to incarcerate as younger prisoners, primarily because of their greater medical needs. Our research shows that prisoner medical expenditure for older inmates range from 3-9 times higher than those for the average inmate.

The report goes on to point out that meeting the medical needs of older prisoners requires a range of medical staff and facility offering different levels of care. Thus, while prison medical care accounts for a significant part of correctional budgets, older prisoners are responsible for a disproportionate share of these prisoner medical expenses. (Exhibit 2 at pp. 74-75).

The Federal Bureau of Prisons (BOP) is aware of these problems and makes efforts to respond to the problems created by incarcerating elderly persons. The BOP efforts were addressed in a February 2008 report by the United States Department of Justice, Office of the Inspector General, Audit Division entitled "The Federal Bureau of Prisons Efforts to Manage Inmate Health Care."(Exhibit 4). The report primarily addresses the BOP's efforts to contain ever rising healthcare costs. However, it also addresses some reactive initiatives designed to

improve the administration, management and delivery of health care to inmates. In 2008 the report found a number of deficiencies and a large inconsistency among the BOP Institutions in providing medical services. The report states:

> Additionally, we found that BOP institutions did not always provide inmates with the medical services expected by BOP Management and identified in BOP Guidance. Our review, as well as evaluations performed by the BOP's Program Review Division, identified medical services that BOP institutions did not always provide to inmates. The BOP Medical Director stated that he expects the institutions to provide these medical services to inmates.
>
> The failure to correct these deficiencies could lead to higher costs for providing health care, decreases in the quality of health care provided, exacerbation of the inmate's medical condition, medical related complaints and lawsuits from inmates, and BOP liability for lack of adequate medical care. (Exhibit 4 at p. 34)

As pointed out in the report, BOP officials assign each inmate a medical classification or care level based on the inmate's individual health condition. Consistent with the BOP web site, Medical Care levels range from Level 1 for the healthiest inmates to Level 4 for inmates with the more serious medical conditions. (Exhibit 4 at pp. 15-16). Based upon her medical records, Ms. Perez-Valledor would be classified as requiring medical care; it is likely that she may require either a Care Level 3 or Care Level 4, described from the BOP web site as follows:

> Care Level 3 inmates are fragile outpatients with medical conditions that require a daily to monthly clinical contact. These inmates may have chronic or recurring mental illnesses or ongoing cognitive impairments that require daily to monthly psychiatric health services or psychology contacts to maintain outpatient status. These inmates may also require assistance in performing some activities of daily living, but do not require daily nursing care. Inmates in this care level may periodically require hospitalization to stabilize the inmate's medical or mental health condition.
>
> Care Level 4 inmates have acute medical or chronic mental health conditions resulting in severe impairments to physical and cognitive misfunctioning. These inmates require services at medical referral centers (MRC's) such as the BOP's Federal Medical Center (FMC), and they require various degrees of nursing care.

The BOP operates six CARE Level 4 Medical Referral Centers (MRC's) identified in the article "Health Care in the Federal Prison System," by Allan Ellis, published in Criminal Justice,

10

Volume 23, No.2, summer of 2008. (Exhibit 5). These include the United States Medical Center for Federal Prisoners in Springfield, Missouri, and the Federal Medical Centers (FMC's) located in Rochester, Minnesota, Lexington, Kentucky, Devins, Massachusetts, and Butner, North Carolina. All of these institutions are located a long distance from Ms. Perez-Valledor's home, family, and friends. Therefore, even with the best of BOP's medical care, subjecting Ms. Perez-Valledor to a prison term will isolate her from her current health care providers and her family; leaving her without any of her critical support system which is necessary not just for health, but for her emotional stability in her seventies.

It is also a fact that prisoners, particularly older prisoners, age more quickly than member of the general population. As states in the HRW report (Exhibit 2 at p. 17):

> In the community age 50 or 55 would not be considered "older". But incarcerated men and women typically have physiological and mental health conditions that are associated with people at least a decade older in the community. This accelerated aging process is likely due to the high burden of disease common in people from poor backgrounds who comprise the majority of the prison population, coupled with unhealthy lifestyles prior to and during incarceration. These factors are often further exacerbated by substandard medical care either before or during the incarceration. The violence, anxiety and stress or prison life, isolation from family and friends, and the possibility of expending most or all of the rest of ones life behind bars can also contribute to accelerated aging once incarcerated.

The U.S. Department of Justice, Federal Prison System FY 2011 Performance Budget, notes that "[i]nmates suffer from the same constellation of medical conditions as the population at large, with significantly higher rates of disease associated with lifestyle and a lack of access to medical resources." The BOP does not break down or characterize its medical costs by ages of the inmates; its budget request reflects the increase in annual medical expenses for all inmates from slightly in excess of $300 million in 2004 to almost $500 million in 2009, an increase of almost $200 million in five years.

The costs of incarcerating Ms. Tanya-Valledor and of treating her growing medical conditions if she is incarcerated will be astronomical.

## CURRENT BUDGET CONSTRAINTS WILL ONLY EXACERBATE
## THE EXISTING HEALTH PROBLEMS

All of the problems of incarcerating elderly and infirm individuals in general and of Ms. Tanya Perez-Valledor in particular which are described in the previous section are only going to be magnified in the coming months and years as the United States wrestles with growing fiscal problems. These issues were addressed by Assistant Attorney General Lanny A. Breuer speaking at the National District Attorney's Association, 2012 summer conference in Groton, Connecticut (Exhibit 6)[3]. At the time he observed:

> The fiscal climate of the past several years, however, has led to significant cuts in state and local government spending, including on Criminal Justice initiatives. At the Justice Department, our budget has remained essentially flat, and we have been operating under a general hiring freeze since January 2011, which means that we are challenged in filing vacant positions for investigators, prosecutors and other necessary law enforcement personnel. This places additional burdens on current employees and, given natural Attrition, means, that over time, our resources will be stretched even thinner.
>
> At the same time that Federal Criminal Justice spending has stayed roughly flat, the number of federal prisoners has increased, and our prison and detention spending has increased along with it. This has resulted in prison and detention spending crowding out other Criminal Justice investments, including aid to state and local law enforcement and spending on programs. And, even with this disproportionate spending, our federal prison system is over capacity with 53% over crowding at high-security facilities and 49% over crowding at medium-security facilities.

There is no doubt this problem will only get worse being that the "sequestration" has been taken into effect. This was pointed out in an article in Business insider entitled, "Sequestration will Wreak Chaos on U.S. Federal Prisons."[4]

> According to the Attorney General's Office, the Federal Bureau of Prisons (BOP) will have to handle a rising number of inmates with major budget reductions, a cut of $338 million.
>
> While other agencies can find ways to do more with less – for example, by reducing procurement, enacting hiring freezes or cutting services – BOP has to maintain constant security at federal prisons around the country with even less money. The solutions will not be pretty.

---

[3] Reprinted at www.justice.gov/printf/printout3.gsp .
[4] See www.businessinsider.com/sequestration-federal-prisons-2013-2

The article points out that according to DOJ, the sequestered budget cuts will result in a five percent reduction in the bureau's workforce which will be achieved by freezing future hiring and furloughing 36,700 staff for an average of 12 days. This means that almost every employee will have to go home without pay for some time, leaving BOP to function at unnecessarily low security levels. This, despite the fact that "according to the 2012 Justice Department Annual Report, the system is 38% over capacity, a problem that the department has identified as a major weakness. The article points out that as a result of the sequestration, it is likely that the BOP will be unable to activate the five new prisons slated to be open in 2013, that the BOP will be forced to curtail or cancel some of the crucial rehabilitation programs that bring long term savings to the Criminal Justice System, such as drug treatment and vocational and education programs and that the BOP will have to implement full or partial lock-downs across the board, which Attorney General Holder observed in a letter to the Senate Appropriations Chair, "will leave inmates idle, increasing the likelihood of inmate misconduct, violence and other risks to correctional workers and inmates." Thus, the impact on the BOP's budget of incarcerating Ms.Perez-Valledor and the costs of providing him with needed medical treatment is a major concern. On the other hand, the impact of BOP budgetary restrictions on the already questionable quality of inmate medical care is an unknown variable.

The cost of incarcerating Ms. Perez-Valledor, who is both elderly and infirm, literally will be 5 or 6 times the cost of incarcerating a younger, healthier and far more dangerous defendant. For every day that Ms. Perez-Valledor spends in federal prison, the BOP will be deprived of funds sufficient to feed, clothe, house and provide needed rehabilitation and/or vocational training to 5 or 6 other inmates.

### WEIGHING A LIFETIME OF GOOD DEEDS AND ACHIEVEMENT AGAINST THE NATURE AND CIRCUMSTANCE OF THE OFFENSE

It is an unfortunate truth that the Court hears the circumstances of the offense which occurred over a relatively short period of Tanya's life are described in detail, but has only a limited amount of time available to learn about the rest of her life – a life achievement, of respect

and of good works. Such a weighing of circumstances, however, is essential for the Court to reach a decision on what will be a fair and just sentence.[5]

There is no question – as the government undoubtedly will point out – that this case involved a serious offense. Nonetheless, the Court also must recognize that Ms. Perez-Valledor received a set salary for her participation which probation advocates a minor role. She did not originate or organize the scheme. She did not share or claim a share in the profits. She did not hire or recruit others into the scheme. She was not involved in the actual billing. This is not meant to minimize her involvement, but it does serve to place it into context.

Weighed against her involvement in this offense are a life and a career during which Ms. Perez-Valledor established herself as a licensed therapist who dedicated her time in helping the mentally ill.

## MS. PEREZ-VALLEDOR'S COOPERATION

Ms. Perez-Valledor agreed to cooperate, as noted in her plea agreement and was in fact debriefed. Ms. Perez-Valledor's willingness to cooperate can justify a variance under §3553(a). Even when the government does not file a 5k1.1 Motion, a court may consider efforts to cooperate to justify a variance. See United States v. Fernandez, 443 F.3d 19 (2nd Cir. 2006). See also United States v. Doe, 213 Fed. Appx. 660, 663 (10th Cir. 2007)(unpub.) (A district court should address cooperation as part of it §3553(a) analysis even in the absence of a 5K1.1 motion when raised by the defendant. See also United States v. Ochoa-Ramos, 2008 WL2062341, at 3 (E.D. Wis. 2008).

## MS. PEREZ-VALLEDOR'S LACK OF CRIMINAL HISTORY OR CONDUCT SUGGESTS A LOW RISK OF RECIDIVISM

Ms. Perez-Valledor not only has no prior convictions, but she has engaged in no prior criminal conduct nor has she had any contact with law enforcement at any time in her life. Many courts have recognized that any jail sentence (even a short sentence) has a much more significant effect on a first offender than on someone who has prior convictions or prior contact with law

---

[5] The very first factor which the Court is mandated to consider in 18 U.S.C. §3553(a) is "(1) the nature and circumstances of the offense and the history and characteristics of the defendant."

14

enforcement. See *e.g.*, *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006)("Significant is the district courts finding that a prison term would mean more to Mr. Baker than to a defendant who previously had been imprisoned."); *United States v. Willis*, 479 F. Supp. 2d 927 (E.D. Wis. 2007)("A downward variance of 60 months to one year and one day justified in part because sentence provided a substantial punishment for someone like defendant, who had never before been to jail"); *United States v. McGee*, 479 F. Supp. 2d 910(E.D. Wis. 2007)(a downward variance from range of 21-27 months to one year and one day imposed because the defendant "had never before been to prison and generally a less period of imprisonment is required to deter a defendant not previously subject to a lengthy incarceration than is necessary to deter a defendant who has already served some serious time yet continues to reoffend."); *United States v. Cull*, 446 F. Supp. 2d 961 (E.D. Wis. 2006)(a downward variance from range of 10 to 14 months to two months jail followed by four months home confinement justified because "defendant had never been confined before so [two months jail time] was sufficient to impress upon him the seriousness of the offense and deter others under similar circumstances.") *United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005). Moreover, a first time offender sentenced to any prison time is much less likely to recidivate than all other offenders, see *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (the court cited the Sentencing Commission's Report, Recidivism and the First Offender (May 2004) suggesting that individuals with zero criminal history points are less likely to recidivate than all other offenders.).

## MS. PEREZ-VALLEDOR'S AGE SUGGESTS A LOW RISK OF RECIDIVISM

Ms. Perez-Valledor's age suggests a lower risk of recidivism and, therefore, even a non-incarcerating sentence would be sufficient to satisfy §3553(a)(2)(B) and (C)'s requirements that the sentence afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant. Defendants "over the age of 40…exhibit marketedly low rates of recidivism in comparison to younger defendant. See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at 12, 28 (2004) ("Recidivism rates decline relatively consistently as age increases"). Ms. Perez-Valledor is 69 years old with no prior criminal record whatsoever. See *Simon v. United States*, 361 F. Supp. 2d 35 (E.D.N.Y. 2005)(under the guidelines, age was not normally relevant to sentencing. §5H1.1. Post *Booker*,

however, at least one court noted recidivism drops substantially with age.) *U.S. v. Groos*, 2008 WL 5387852 (N.D. Ill., 2008) (district court considered that lengthy incarceration for crimes involving shipping of embargoed goods were ineffective to the aid of deterrence and the period of uncertainty resulting from the four-year delay in prosecuting the case against defendant provided significant punishment which merited a non-guidelines sentence. Court imposed sixty days incarceration and one year supervised release with a fine, despite guidelines recommendation of 24-30 months); *U.S. v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2006) (where guidelines called for life sentence for securities fraud, court imposed forty-two months sentence partly based on "considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective, "white collar offenders" and the government failed to present any evidence or empirical studies that a sentence of more than 3 ½ years was necessary to achieve the retributive deterrence objectives of §3553(a)), *U.S. v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005) (generally, a lesser prison term is sufficient to deter one who has not been subject to prior lengthy incarceration). *U.S. v. Hughes*, 825 F. Supp. 866 (D. Minn. 1993) (the court noting that " the non-rehabilitation purposes of incarceration-retribution, deterrence, and incapacitation-would all be more than adequately served by a far shorter sentence. Both society and the defendant will pay a dear cost for this sentence and receive very little in return.")

### MS. PEREZ-VALLEDOR'S EDUCATIONAL AND EMPLOYMENT BACKGROUND

Ms. Perez-Valledor has, throughout her life, made extraordinary efforts to educate herself and has a very strong history of employment. The PSI ¶ 73 through ¶ 75 has detailed her education and achievements with certificates and awards having previously provided to probation.

### MS. PEREZ-VALLEDOR'S GOOD CHARACTER

Ms. Perez-Valledor's otherwise law-abiding and productive life, devotion to her family and impeccable reputation in her community are factors in and of themselves which warrant a downward variance from the prescribed guideline range. A defendant's otherwise good character has repeatedly been relied upon by courts to justify a variance below the prescribed guideline

range. In *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009), the court affirmed the District Court's *sua sponte* variance to probation from a recommended guideline range of 41 to 51 months, in part, citing the defendant having no history of substance abuse, no interpersonal instability, no sociopathic or criminalistic attitudes, being motivated and intelligent and having support of his wife and children. The court noted that these factors "undoubtedly constitutes 'history and characteristics of the defendant'" as contemplated in 18 U.S.C. §3553 (a)(1). *Id*. at 874. In *United States v. Wachowiaka*, 412 F. Supp. 2d 958 (E.D. Wisconsin 2006), *aff'd* 496 F.3d 744 (7th Cir. 2007), the court granted a downward variance from the guideline range of 121 to 150 months and sentenced the defendant to 70 months in part because "the guidelines failed to consider defendant's otherwise outstanding character, as depicted in many supportive letters discussed above. As I have noted in previous cases, while §3553(a)(1) requires the court to consider the character of the defendant, the guidelines account only for criminal history. In cases where the defendant led an otherwise praise worthy life, the court should consider a sentence below the advisory guideline range." *Id*. at 963.

## CONCLUSION

A non-incarcerative sentencing such as house arrest or probation has been recognized by the United States Supreme Court as carrying extremely significant consequences:

> Offenders on probation are nonetheless subject to several
> standard conditions that substantially restrict their liberty…
> Inherent in the very nature of probation is that probationers
> do not enjoy the absolute liberty to which every citizen
> is entitled…Probationers may not leave the judicial district,
> move, or change jobs without notifying and in some cases
> receiving permission from their probation officer or the court.
> They must report regularly to the probation officer, permit
> unannounced visits to their homes, refrain from associating
> with any person convicted of a felony and refrain from
> excessive drinking. U.S.S.G. §5B1.3. Most probationers
> are also subject to individual 'special conditions' imposed
> by the court.

*Gall v. United States*, *supra* at 595-596.

As noted, the United States Supreme Court has recently affirmed the proposition that this court's sentence must be tailored to the history and characteristics of the individual as much as the offense itself. Ms. Tanya Perez-Valledor began working at Biscayne Milieu with all good intentions and slowly but surely began to take shortcuts and ultimately falsified reports. However, Ms. Perez-Valledor is generally a good person. Ms. Perez-Valledor is exactly the type of individual this court should show as much mercy as it possibly can. As Supreme Court Justice Anthony Kennedy stated before the Senate Judiciary Committee on February 14, 2007: "Our sentences are too long, our sentences are too severe, our sentences are too harsh…[and because there as so few pardons] there is no compassion in the system, there is no mercy in the system." In a speech to the A.B.A. in 2003, Justice Kennedy also states: "A country which is secure in its institutions, confident in its law, should not be ashamed of the concept of mercy." Given all the facts and circumstances of the instant case, it is respectfully requested that a significant variance below the prescribed sentencing guideline range and below the two-year sentence request from the government would be both fair and reasonable.

WHEREFORE, the defendant respectfully requests this Honorable Court for a downward variance from the prescribed guideline range.

Respectfully submitted,

By: /s/ Rae Shearn
Rae Shearn, P.A.
Florida Bar No.: 634077

**CERTIFICATE OF SERVICE**

      IT IS HEREBY CERTIFIED that the foregoing motion has been filed with the Clerk of the Court using CM/ECF. It is likewise certified that the foregoing is being served this day on all counsel of record by way of the same electronic filing utilizing CM/ECF on this 28th day of June, 2013.

> By: /s/ Rae Shearn
> Rae Shearn, P.A.
> Florida Bar No.: 634077
> Law Offices of Rae Shearn, P.A.
> 1101 Brickell Avenue
> Suite N1101
> Miami, Florida 33131
> Phone 305-545-0014
> Facsimile 305-545-0097